Mr. Clark you may proceed. This case deals with the issue of competition in the context of nephrology practice. The medical specialty of nephrology, like most specialties, is a referral business. There are people that suffer from kidney disease, which nephrologists treat, typically don't self-diagnose. They go to an internal medicine doctor or another doctor and show symptoms and then they're referred to a nephrologist by the doctor. The two types of patients that nephrologists typically see are office patients, which are sometimes referred to in the briefs as pre-ESRD patients, pre-end-stage renal disease, which are treated in the office, and then ultimately pre-ESRD patients become ESRD patients or end-stage renal disease patients, which require dialysis. Dialysis and QCNA, Quad City Nephrology Associates, which was the defendant in this action along with Dr. Alla, and both plaintiff and Dr. Alla were principals of QCNA and still are, is a nephrology practice. QCNA is a nephrology practice. The dialysis facilities are something separate from QCNA. Dialysis facilities are places where ESRD patients go to receive dialysis treatments. They need to go three times a week for approximately four hours. Because of the frequency and the duration of the treatments, because of their fragile medical conditions, they typically go to the closest facility. Nephrologists may have privileges to round on patients at a dialysis facility. This case arose, initially the facts arise from an opportunity for QCNA, the nephrology practice, to expand it to Dixon. In 2003, the testimony, undisputed testimony, was that Dr. Alla was approached by a KSB hospital administration in Dixon because a large chain of dialysis facilities, DaVita, which had a dialysis facility in Dixon, was pulling out because it didn't deem it profitable enough or for whatever reason. The patients that caused the KSB administration and the patients that received dialysis in Dixon, because they then had to travel down the road to Stirling, the next closest dialysis facility. The plea from the administration and the patients in KSB and in Dixon was for Dr. Alla to establish a dialysis facility there and also for QCNA, the nephrology practice, to come out and set up a nephrology practice there and see the patients that were receiving dialysis. The testimony was undisputed that in February 2004, QCNA began practicing there when the new dialysis facility opened. In April 2004, Kling objected to QCNA practicing there. He sent a letter which was, I think, discussed in both briefs extensively. The quote in the letter was that Dixon is so far that it is not a competitive threat to QCNA. He sent a subsequent letter May 27th indicating that he did not want QCNA billing for nephrology services in Dixon and he wanted it to be pulled out. So, pursuant to his request, later that summer in 04, the QCNA stopped billing and a new entity, MNG, Midwest Nephrology Group, which was owned by Dr. Alla, started billing there. The standard of review we assert in this case is de novo. There are questions of law concerning the interpretation of contract on undisputed facts. There are questions of law regarding where material facts are undisputed that applies to both the estoppel and waiver defenses as well. The issue of de novo review was accepted by plaintiff in the trial court in the motion to reconsideration. It did not challenge de novo review. The main provision that you saw in the briefs discussed is 12.01G. That provides that the covenant not compete, which applied to all members of QCNA, including Dr. Alla or owners of the dialysis facility, would enter into competition or attempt to compete with QCNA. We compete and competition was not explicitly defined in the agreement. We cited in our briefs to the Black's Law Dictionary for the definitions of those two terms. One, compete to strive for something that another is striving for, essentially. Competition is a struggle between rivals for the same trade at the same time. We submit that the court erred because plaintiff totally failed to prove any competition whatsoever. The evidence was uncontested that the only way the nephrology practice would get new patients in was through referral sources. The evidence was uncontested that 100% of QCNA's referrals came from entities other than the KSB hospital physicians. The new entity that was created at plaintiff's behest, Midwest Nephrology Group and Dixon, once QCNA pulled out of Dixon, 100% of their referrals came from KSB physicians. So there was no overlap, no competition whatsoever for referral sources for patients. Plaintiff conceded at trial and in his post-trial briefs and even in their closing that they weren't arguing that Dr. Ala sought out QCNA patients for the Dixon practice, the MNG practice. He did not argue that QCNA patients did in fact follow Dr. Ala from QCNA to MNG out in Dixon. There was also no evidence that there was any impact on the revenants of QCNA by virtue of MNG being in existence. Plaintiff concedes there were no loss of patients due to Ala's, anyone following Dr. Ala from the QCNA Quad Cities practice all the way out 70 miles away to Dixon. The evidence concerning the relevant marketplace was uncontested in that QCNA prior to February of 2004 never had a practice in Dixon. They never had an office in Dixon. They never had privileges at Dixon area hospitals, KSB or CGH. That QCNA had no patients from Dixon. QCNA had never received a referral from a KSB physician and that QCNA provided no nephrology services in Dixon. The trial court found two patients, at least two patients were transferred from the one group to the other group. What the trial court found was that there were two patients that plaintiff identified that he thought had left, stopped receiving dialysis in the Quad Cities and went out to Dixon and that was correct. There were those two patients and there were two patients out of 3,000 patients. But what the evidence was uncontradicted on was that those patients did not go out there by virtue of Dr. Ala's reputation or for any reason. There were intervening circumstances. There was no causal connection between any sort of competition by Dr. Ala or MNG. Well, they transferred from one group to MNG, right? They transferred dialysis facilities. They were the ESRD patients that were on dialysis. And there was one that was a nursing home patient who was essentially on her deathbed. She transferred to be close to the family for the final two weeks of her life. And she, because of the fragile nature, she wanted to be close to her family and she switched from the dialysis facility in the Quad Cities area out to the dialysis facility in Dixon. By virtue of being at the Dixon dialysis facility, she was then rounded on by MNG and received nephrology services. Well, maybe I'm being too simplistic about this, but at one point the first group gets the money. Then they transfer and the next group gets the money, right? For the services. Presumably if they weren't indigent patients. There was no evidence about whether or not they were indigent patients when they were receiving. But there wasn't a switch in nephrology practice itself. There was a switch from dialysis facilities. And they went to the Dixon dialysis facility and the only nephrologist that rounded on patients at the Dixon dialysis facility was MNG. And that was by virtue of the fact that Dr. DeHaul, the plaintiff, asked that QCNA no longer do that and they pulled out. I mean, arguably then just those two patients alone would trigger the contract language with regard to competing. No, because there was no competition. There was no struggle. There was no activity that caused those two patients to move. The one was on her deathbed. The other was a gambler who lost his ability to drive. He would drive to the Quad Cities so he could go on the boats. The evidence was uncontested about that. He would drive. He actually lived near Dixon. He would drive to the Quad Cities to gamble on the boats in that area. Then when he ultimately lost money, lost his license, lost his ability to drive, then he had to rely on family to get him to a new dialysis facility. We're totally intervening circumstances. There's no causal connection between any sort of activity by Dr. Ahler or MNG that amounted to competition. So you're defining competition now as who's getting the money or who's getting paid for services, but rather who advertises, something like that? Well, who gets a patient by virtue of some sort of effort? Marketing and ads? It could be marketing and ads. It could be struggle for the referral sources. The referral sources is typically how they get the patients, and there was no overlap of referral sources. But these people, by virtue of just totally intervening circumstances, switched dialysis facilities, and when they switched dialysis facilities, they were rounded on by the Midwest Nephrology Group. Had Midwest Nephrology Group not been there, they most likely would have gone to some place in between, the seven miles in between Quad Cities and Dixon, such as the Sterling facility. And there was no loss to QCNA by virtue of any competition or the existence of MNG. There was a loss due to intervening circumstances. Plaintiff had the burden of proving that there was competition. Plaintiff had the burden of proving that these folks switched solely by virtue of Dr. Ahler's presence out there. And that's not what the uncontested testimony showed. Well, he was there. Yes. By his effort, he was there. He was there initially as QCNA, and then he was there as MNG solely because Plaintiff requested that QCNA stop being there. But he was there through his effort, which is competition, is it not? If he was competing for the same patients, if he was trying to get the same patients, by this analysis, just the fact that one patient left and ended up at the other place, then that would be, if that would be the analysis, if that would be the definition of competition, then it could apply worldwide. If someone left and there's, if he would have set up a dialysis facility and nephrology practice on the other side of the world and the person was vacationing in China and went there, then that would be competition under that definition. Isn't that the whole premise for covenants not to compete? Is that I don't want somebody who does my same work in my same area. It doesn't necessarily require that that person who has been with you and who's gone someplace else is actively soliciting the patients or anything. It's just the fact that they're there within the same area. And didn't DeVita reopen? DeVita reopened, yes. DeVita reopened in Sterling. That would be the other alternative for these folks to go to. So they could have gone there. Yes. But they elected to go with MS. Yes. And in answer to your first question in terms of whether that's the premise of covenants not to compete, the covenants not to compete here is that they won't compete with a facility. If by opening a dialysis facility and by practicing nephrology in a place where, QCNA never had a presence before, that would have not withstood a challenge in terms of being a restrictive covenant because there was certainly zero evidence of any goodwill of QCNA in the Dixon area. It's uncontested. Well, that's not actually accurate, is it? Didn't QCNA have a presence in Dixon between February and July? Yes, they had a presence there. But that was presence and that was based on a doctor to haul the plaintiff going along with QCNA setting up that presence. And the facts there are uncontested. But prior to February 4, there was zero presence and zero evidence of QCNA ever being present in that area. Okay, but there was presence between February and July. Yes, and that is not, although that was argued brief, that was never the premise at the trial court that by setting up MNG after the February through July timeframe, that that was somehow competing with QCNA's prior presence there. That was raised in the appellate brief, but that was never an argument at the trial court level that somehow MNG was infringing upon QCNA's presence there between the February and July 04 timeframe. The February and July 04 timeframe was set up, and QCNA set that up with Dr. DeHaul, the plaintiff having full knowledge, and with him going along with QCNA's activities and setting up there. He's got a lot of application for KSP Hospital. He had blood tests. He had various activities. It was only after he raised the objection to it, it was only after he sent a letter in April and then a letter in May 27 saying that we don't want QCNA being there anymore, that QCNA pulled out and MNG went in. And that's where our estoppel and waiver defense has come from, what we think we do. We showed that as well at the trial court, aired, and I don't know if Randy knows. We may have time in reply. Thank you. Thank you, Mr. Clark. Thank you. Mr. Anditch, you may respond. Thank you. May it please the court, counsel. For the record, my name is David Anditch. Good morning, Your Honors. I represent Dr. Rehendra DeHaul, the plaintiff appellee, Your Honors. Rarely have I stood here in this courtroom and had a case where the lawyers and the parties disagreed so much about what the issues were, what the law is, and what the evidence shows. I think this may be the ultimate case for that. And it begins at a very threshold level, our differences, as you saw in the briefs, over the standard of review that this court should apply. Obviously, both parties believe the standard of review is extremely important. We submit to this court that the standard this court should apply is the abuse of discretion standard. In this situation, where an appellate court is reviewing either the granting of a declaratory judgment or the denial of a declaratory judgment, courts across the state, numerous decisions by this court, including the Galesburg Clinic v. West decision that came out of this court, Justice Kohler, in 1999, indicate the review of a decision on a declaratory judgment, granting or denying, is an abuse of discretion. It is not de novo. With respect to the latter issues of the Staple and Waver, counsel claims that the standard on those issues are also de novo. We submit and differ considerably and submit to the court that it's either an abuse of discretion or the manifest weight of the evidence on those two issues because they are historically viewed as what we call fact issues, and as a consequence, the manifest weight of the evidence standard is what normally would be used and was used by this court in the Galesburg Clinic v. the West case. I would ask the court to look very, very carefully at the standard of review because I believe it is a threshold level question that is absolutely important to this court's analysis. We continue our differences, of course, in the statement of the issue. We believe the issue is simply did Dr. Ala, under paragraph 1201G of the operating agreement, did he attempt to compete or compete against QCNA, thereby releasing Dr. DeHaul from the covenant not to compete that was set forth in paragraph 1201B. I would urge this court, as a starting point, to read the language of paragraphs 1201B and 1201G very, very carefully. They are very different provisions, and I think you hear an awful lot about a covenant not to compete, particularly from opposing counsel's briefs. We submit to the court that 1201G is absolutely not a covenant not to compete. It is a provision that releases or discharges Dr. Ala and Dr. Cashore, who was also there at the time and was entered into. It is a release or discharge provision from the covenant not to compete that exists only in 1201B. So 1201B and 1201G are entirely separate provisions, and once you define that issue, it leads you very directly to a body of law that is really well recognized by the Galesburg Clinic case versus West of 1999. And more recently, the 2006 decision by the Illinois Supreme Court that is cited in counsel's brief, not in my brief, but cited in counsel's reply brief, it's a Supreme Court decision which relies in part in analyzing this issue of whether the physicians in the Mohanty case are discharged relies in large part on the Galesburg Clinic case that this court rendered in 1999. And the analysis is that that provision is a release-discharge provision under fundamental basic contract law. And the premise or the origin of the doctrine as it became applied to covenants not to compete to determine if a release occurred was contract, was the basic principle of contract law that if one party breaches a contract, the other party is released from his or her obligations. Probably one of the most basic principles of contract law that you can have. That is the principle of law that this court, the singular principle really, that this court should apply to this case. We submit there is ample evidence to demonstrate that Dr. Olive attempted to compete and compete. And I would put an emphasis, it's hard to do it when you're speaking orally, obviously, under the attempted to compete. But I would urge the court to read 1201G literally and carefully. There were an awful lot of times when Mr. Clark addressed the court and said what 1201G bars is competition. That is not correct. And I think Justice McCain, Justice Carter, by your questions were very much focused. It isn't just barring competition. It bars the attempt to compete. It bars the attempt to solicit and the solicitation. So as the court understood it, it's a very, very, very broad release and discharge provision. And I think Justice McGade is absolutely correct. And if you look at the finite holding of Judge Message in the trial court, the establishment of MNG there was the attempt to compete. And Judge Message made that quite clear in his holding. Judge Message says there is no question in the court's mind that the establishment of MNG was the kind or has turned out to be the type of conduct that does enter into competition or attempts to compete with QCMA, either directly or indirectly, by any means or any basis. That's the language. It's virtually a verbatim quote out of 1201G. It goes on, no question in my mind about that. And with respect to your questions, Justice Carter, on a page or two down when he's giving his oral opinion, Judge Message says very accurately, if there was no Midwest, we wouldn't be here. And I think that's, in large part, a very succinct basis of the holding and the evidence. He goes on to say, I don't care whether they could travel to the Quad Cities or for dialysis under QCMA because you can't get around the fact that two people, for whatever reason, one in death's door, the other can't drive, the money that QCMA has been getting now went to MNG. And I think Judge Message has capsulized the summary and the essence of the case extremely well in those conclusions. That is exactly what happened here, and that is the attempt to compete and the competition. If you look at the record and you look at the briefs, you'll see, Your Honors, that there is a complete agreement between the lawyers, again, on how many patients may have left QCMA and ended up at MNG. Dr. DeHaul testifies that he recalls having a patient from Sterling and five patients from the Dixon area. In arguments and questioning by counsel, they're talking about somewhere different counsels are mentioning three patients or five patients. There is no question, at a minimum, as Justice Carter indicated, there were two patients who ended up in Dixon at MNG. But the actual range, I believe, in the way I phrased it in my brief, is somewhere between two to five is what ended up there, which satisfies the actual competition, not just the attempt to compete. Either one would have worked to discharge or release Dr. DeHaul. I would also like to mention briefly, since I took a bit of a beating in my brief, I relied and cited in the court other provisions of the 40-page operating agreement that we believe all of this evidence substantiated a conclusion by Judge Message that there was a breach of the operating agreement. The law is extremely clear from this court, from every court. In fact, when I looked at Westlaw, there were 23 decisions from the third district alone that this court has the authority and the jurisdiction to affirm a trial court judgment on any reason that arises from the record, regardless of what the judge in the trial court said. It is one of the basic principles of appellate review. As a consequence of that principle, I felt very comfortable in mentioning that Dr. Alla also breached Paragraphs 2.03, Article 3.02, Article 3.03. He was obligated to devote 100% of his attention under 3.02 and 3.03 to QCNA, and he didn't do that. He violated these other provisions. The operating agreement from page 1 to 40 was referred to hundreds of times in the record during the trial. And those provisions are absolutely part of the evidence of this case. But you don't contend that violation of those provisions discharges Dr. DeHaal from the… They are material breaches. They are a condition, not just, Justice McDade, not just his competition or Dr. Alla's attempt at the beat by establishing MNG, but there were other breaches by the same evidence that established, the very same evidence that establishes MNG and the attempt to compete in the competition, also proves and demonstrates that Dr. Alla breached Articles 2.03, for example, that the locations of QCNA had to be approved by all the managers. A unanimous consent. Obviously, that didn't occur in this case. All the managers, secondly, in 3.02 were obligated to spend 100% of their time and their attention and their skills devoted only to the patients of QCNA. Clearly, that didn't happen. The same evidence, Your Honor, is what I'm getting at, that establishes the breach of Article 1201G under the operating agreement, also establishes the breach of at least three other provisions of the operating agreement, including… I'm sorry. Thank you. So, I would urge the court to look at that as well. I'd also like to spend, I guess, my last two minutes, perhaps, on the estoppel and waiver issue, Your Honors. Before you do that, you're confusing me a little bit here with your discussion about those other provisions. Yes. I thought that your issue was that by violating the non-compete, if you will, that Dr. DeHaal is discharged from the non-compete that applies to him. That is my argument, Your Honor. Okay. So, those other provisions, while they may demonstrate breach in other ways, don't really go to that question, do they? I think that's one interpretation this court could come to. The reason I raise the issue is because if you look at this court's decision in the Galesburg Medical Clinic Association v. West case and the Supreme Court's decision, they talk about, for reasons I'm not altogether clear in my own mind, they talk about a material breach that in these line of cases or this line of cases involving doctors and other employees and professionals under provisions not to compete, that you need a material breach. I believe that law was actually incorporated, in effect, into 1201G. These parties said, when they set out to agree, that it would be considered material if Dr. Ala attempted to compete, attempted to solicit, or whatever, and that would discharge him, so that would be enough. I'm just emphasizing or bringing to the attention of the court that that wasn't the singular breach or violation of the operating agreement. There were other provisions of the operating agreement that the same evidence established breaches for. That was all I was making, the only point I was making. With respect to the waiver issue, I think I'm getting low on time, I just wanted to mention, again, waiver and estoppel, very disputed evidence by both parties as to when Dr. DeHaal learned about what was going on in Dixon. He testified that he didn't even know that Dr. Ala was down there practicing until late in 2003 or early 2004, he learned that. I think that a fair reading of the record shows an enormous amount of differences and disputes between Dr. DeHaal and Dr. Ala about the evidence that would go to this estoppel waiver. Assuming that those defenses exist and are available, the only other thing I would mention as I'm running, I guess, I would also ask the court to take a look at section 14.09, which is entitled waivers, and says that the failure of a person to demand strict compliance does not bar any other subsequent act as being a breach. As a consequence, if you read 14.09 literally, the parties agreed when they entered into this operating agreement not to have waivers or estoppels arguments in the event there was litigation. They took it absolutely and completely out of the agreement. In conclusion, your honors, I believe that a thorough review of the record and the ethical law demonstrates the judge's message was absolutely correct in all his rulings. Including, as he said, on the waiver and estoppel issues, he specifically says that he found Dr. DeHaal's testimony more credible. Thank you very much. Mr. Clark, you may reply. Thank you. In terms of the issue that the plaintiff raised about the transfer of patients and how it was focused on by the judge, that transfer, there was only two patients. There were five patients and they were all enumerated and we used for HIPAA purposes A through E in terms of the five patients. Only two were found to have been seen at the Quad Cities dialysis facility and then the dialysis facility out in Dixon. The other three were discarded for separate reasons. I know one at least had to move back to Chicago to follow the doctor after receiving the transplant and no longer needed dialysis. The 12.01G is clearly a covenant not to compete. It is a restriction on competition for which there are consequences. It bars Dr. Ala from competing with QCNA and if he does, then there's a consequence, an adverse consequence. And that's Dr. DeHaal being released from his non-compete. And because it is a non-compete, then the court has to scrutinize the court's interpretation of 12.01G as a non-compete. To the extent the court is holding that the mere fact that some patients left, two patients out of 3,000, .06, six one hundredths of a percent, actually ultimately ended up being seen by the other group in an area where QCNA did not practice, that was quoted in his letter and Dixon was an area that was so far away it was not a competitive threat to QCNA. That is essentially a blanket prohibition on competition, at least to the observed result that we discussed in our briefs. And that's another reason why the court's decision in interpreting the two patients and relying upon the two patients is a reason for reversal. The plaintiff also tries to use the Galesburg cases, talking about material breach, to kind of shoehorn into the various other sections of the operating agreement. You'll see these various other sections of the operating agreement, not devoting enough time. These were issues that were addressed in counts two and three of the complaint, which were dropped by plaintiffs prior to trial. These were not part of count one. Count one focused on 12.01G. So that, it weren't even before the court. In addition, there was no proof that Dr. Ala did not devote his full professional time to, sufficient time, to QCNA. The plaintiff was asked point blank whether or not he knew how much time Dr. Ala spent with QCNA, whether he spent enough time, and he had no response in terms of any indicia that Dr. Ala was not spending enough time with QCNA. And the uncontested evidence showed that QCNA financially thrived and continued to grow throughout the time period that MNG was in existence. In addition, those other provisions, 2.03, 3.02, 3.03 of the operating agreement, were never shown to be material. Under the Galesburg test, materiality is whether or not a plaintiff would not have entered into the agreement. But for those provisions, there was no testimony to that effect. 14.09, the non-waiver provision, is addressed in our briefs. It, again, was not raised in the lower court, should not be raised at this stage. And also, it's facially inapplicable. The facts that relate to Staple and waiver are not disputed. The facts we rely upon are that in June or July of 2003, the plaintiff knew that Dr. Ala intended that QCNA would set up a practice in Dixon. That's on page 14 and also page 47 of the plaintiff's brief. In October, Dr. DeHaul admitted and he put his signature on applications for KSB. Thank you. Meaning that he was preparing to practice in Dixon. In December, he submitted to a rubella test. He provided further documentation applying to KSB. In January, he was also doing the same thing. In February of 2004, that was all events leading up to, uncontested events leading up to, the opening of the facility and the start of QCNA practicing in February of 2004. It was only after February of 2004 that Dr. DeHaul, the plaintiff, indicated that he didn't agree with QCNA being out there. And when he did say that, he didn't. Another part of our waiver to stop offenses is what he did say when he did object. In his April letter, he did not say that it's going to compete. It's going to compete with QCNA. He said that it's so far that it does not make any difference to our practice here in Moline. It's not a competitive threat to our practice. And in May, in his May letter, May 27th, he said, any billing that is done at the Dixon Dialysis Facility should not be done under QCNA. It was at his request, at his behest, because of lifestyle reasons, because of other reasons that he set forth in his letters, that Dr. DeHaul pull out of QCNA and then put MNG in its place. Under these circumstances, plaintiff cannot be allowed to take a turnabout and now claim that the practicing in an area where he said was so far it's not a competitive threat is now a competitive threat. And thus the violation of 12.01G. Thank you very much. Thank you, Mr. Clark. Thank you, Mr. Adich, for your arguments this morning. In this matter, it will be taken under advisement.